Points decided.

[No. 2,840.]

DANIEL SILL, JR., v. MICHAEL REESE AND ABEL GUY ET AL.

EVIDENCE TO IDENTIFY LAND SOLD.—When a bill of sale of a lot of land contains no description of the land sold, but is written on the back of a copy of the grant of the lot, made by an Alcalde, while California was a part of Mexico, and refers to this copy for a description of the lot, the copy may be received in evidence for the purpose of identifying the lot sold, and such copy constitutes a part of the bill of sale.

PRESUMPTION OF DELIVERY OF CONVEYANCE.—Since no registry law existed in California under the Mexican Government, and it was necessary for each proprietor to keep within his own control his muniments of title, the presumption is, that when a person sold to another an undivided half of a lot granted by an Alcalde, and endorsed a conveyance of the same on the grant, referring to the grant for a description, that he kept the original, and delivered to the person to whom he sold a copy of the grant and a duplicate of the conveyance endorsed thereon; and under such presumption, such copy and duplicate conveyance endorsed thereon are admissible in evidence.

DELIVERY OF CONVEYANCE.—A party who claims title under another has a right to show that the conveyance to such other was delivered when made.

PROOF OF DELIVERY OF CONVEYANCE.—In a contest concerning a lot, granted by an Alcalde, while California belonged to Mexico, a party claiming under the grantee does not prove the delivery of a conveyance to him by the grantee by producing the original grant.

IDEM.—A party who claims title under a conveyance made to his grantors, makes *prima facie* proof of the delivery of the conveyance to his grantors by producing it in Court.

LIMITATION OF EFFECT OF EVIDENCE.—Counsel who, when evidence is offered, make declarations of a limited purpose for which it is offered, are not estopped, after it is received, from drawing from it other deductions than those contained in the offer, unless injustice will be done the opposite party by permitting such new deductions; and such deductions cannot be made out by mere assumption, outside of any fact appearing in the record.

IDEM.—Counsel has no power to limit the effect of evidence, but its effect is regulated by the Court in its charge to the jury.

IDEM.—The statement by counsel of a purpose for which evidence is offered is only a reason given why evidence should be received.

STRIKING OUT ANSWER OF WITNESS.—The party moving to strike out the answer of a witness to a question, must specify his objections to the answer with the like particularity as in an objection to a question.

ACCOUNT BOOKS OF THIRD PARTIES AS EVIDENCE.—Entries in account books kept by third persons, not parties to the suit, may be received in evidence after the death of the party making the entries, when the entries

are contemporaneous with the principal fact sought to be proved, and form a link in a chain of events, and are a part of the *res gestae.*

IDEM.—The above rule is not confined to entries against the interest of the parties making them, but extends to entries for his interest.

IDEM.—When it is sought to be proved that a house was constructed by a certain person, as one of a chain of events to show that he owned the lot on which it was built, and evidence is given tending to show that a certain firm built the house and furnished the materials, the account books of such firm are admissible in evidence, to show that they charged the labor and materials to the person who, it is claimed, constructed the house, as such entries are one of a series of contemporaneous circumstances, to show who owned the house.

IDEM.—The entries in such book of charges, made against a person who is a witness on the trial, may also be received in evidence to impeach the witness.

IDEM.—The entries in such books may also be received in evidence, while the person who made them is living, as one of a series of events to contradict witnesses as to the time a partnership existed, and where its place of business was.

PRESUMPTION THAT OFFICERS DO THEIR DUTY.—The presumption is that public officers in charge of official documents, have done their duty in preventing forged papers from being placed among them, and this presumption applies equally to the public functionaries of Mexico, as to those of the United States.

PRESUMPTION AS TO GENUINENESS OF SIGNATURE TO OFFICIAL DOCUMENTS.—The genuineness of the signatures to the official documents of officers of Mexico, which are now in the custody of the Surveyor-General of the United States, will be presumed in a case where such signatures are used for a collateral purpose, such as to enable a witness who has examined such documents to testify as to the genuineness of the signature to a paper offered in evidence, from having seen such signature on such documents.

PROOF OF GENUINENESS OF SIGNATURE.—A witness whose only knowledge of another's signature has been derived from an examination of official documents in official custody, purporting to be signed by such other, may give his opinion as a witness as to the genuineness of such person's signature to a paper offered in evidence.

RECORD OF JUDICIAL INVESTIGATION AS EVIDENCE.—The record of an open investigation, judicial in its character, which occurred in California before an Alcalde in San Francisco, is admissible in evidence, as a circumstance which may have come to the knowledge of others, and which, if it did, should have influenced their action in relation to a material matter in controversy.

ALCALDE'S BOOKS AS EVIDENCE.—An entry made by an Alcalde in San Francisco, in 1846, of the presentation to him, by the claimants, of title papers to a lot made by a former Alcalde, are evidence in ejectment tending to show that the claimants then made an open adverse claim to the lot.

EVIDENCE IN EJECTMENT.—When, in ejectment, the defendant proves that for a series of years the plaintiff did not assert his title to the person in

possession, the plaintiff cannot introduce evidence that he consulted with a person about recovering possession, if such consultation was not communicated to the person in possession.

INSPECTION OF DOCUMENT BY JURY.—When, in his argument to the jury, counsel insists that a word in a document offered in evidence was originally written different from what it then appears, and has been changed to another word, and the Court then permits the jury to inspect the document and judge for themselves, it is not error for the Court to refuse to charge the jury that they may determine for themselves, whether the word has been changed. •

ALTERATION IN DOCUMENT AFTER IT IS SIGNED.—An alteration made in a word or in words in a document, after it was written, and not noted at the bottom before it is signed, is not null and void as evidence, if made innocently, or by consent of the parties.

ALTERATION OF WORD IN DOCUMENT.—An alteration made in a document after it is signed is made innocently, if made to conform the paper to the intention of the parties.

OBJECTION TO CHARGE TO JURY.—An objection to an oral charge to a jury should specifically point out in what the objection consists.

ALCALDE'S GRANTS IN SAN FRANCISCO.—Book A of original grants, in the custody of the Recorder of San Francisco, is admissible in evidence when introduced to prove that other grants were made than those found in "Blotter B."

BLOTTER B OF ALCALDE'S GRANTS.—The fact that "Blotter B," so called, in the possession of the Recorder of San Francisco, shows a certain number of lots granted by the Alcalde in a particular year, does not raise the presumption that he did not grant other lots during the same year.

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

Ejectment to recover fifty-vara lot No. 31, lying at the north-west corner of Washington and Kearny streets. The action was commenced December 16th, 1864. The defendants other than Reese and Guy, were the tenants of Reese and Guy.

The plaintiff offered evidence tending to show that Francisco Sanchez, a Justice of the Peace, or Alcalde, granted the lot to Francisco De Haro, in April, 1843, and placed him in possession, and that De Haro, in the same month sold the lot to Daniel Sill, the father of the plaintiff, and that the grant to De Haro, and his conveyance to Sill, were in Sill's possession in 1843, and that the same were lost in 1847, or before that time, and that Sill, Sr., died in 1862. The plaintiff also introduced testimony tending to

show that Sill, Sr., entered into possession of the lot in 1843, and built a blacksmith shop thereon, and occupied the same; and that he was on the lot exercising acts of ownership over it at various times up to 1849. Plaintiff also introduced testimony tending to show that Sill, Sr., placed John Finch in possession of the lot and building in 1844, and that Finch occupied the same down to his death in 1847, repeatedly admitting verbally that Sill owned the lot, and that he (Finch) occupied it under him. The plaintiff also introduced testimony tending to show that the petition alleged to have been made by De Haro to Sanchez, and the concession made by Sanchez to De Haro of said lot 31, were, in the year 1853, and for some time prior thereto, in the custody of one Ramon de Zaldo, who was the administrator of the estate of De Haro, and that at that time they existed in a form, of which the following is a translation:

"Señor Justice of the Peace Francisco De Haro, resident of the jurisdiction in his charge, shows and makes present in proper form, before you, that having to build a house at the point (*punta*) of Yerba Buena, for the purpose of expediating (*asista*) the business which he may have, needs for his benefit one lot; with this understanding (*virtud*): May it occur to you to serve me by conceding to me one fifty-vara lot, in a square, from those which follow the plan of buildings (*poblacion*).

"Of you I ask a decree, comformable to justice in my present petition, and swear all that is necessary, on common paper, for want of stamped paper (*papel sellado*).

"In the Port of San Francisco        1st, 1843.
                              "Francisco De Haro."

"Port of San Francisco, April 3d, 1843.

"The foregoing petition, being presented and admitted, and in view of what the fact contained in it solicits, I, as Judge of this jurisdiction, Francisco Sanchez, using the rights that are conferred to me, in the particulars of this matter, concede to the party interested the lot of fifty varas that is solicited, and that he may possess it legally and peace-

ably, and that he makes the use of it that he likes. I adjudge to him, by this present title, the above mentioned lot, and I place him in judicial possession, for his security, subjecting himself to the following conditions:

"1st. That he shall, in the precise term of one year, reckoned from the date of this title, have the lot fenced and a house built upon it.

"2d. That he shall conform to all the arrangements of the established rules, or those that may be established.

"3d. If he does not fulfill the observance of the first article of these conditions he shall lose the right to the lot, and if he oppose that of the second, he shall incur the penalty of infraction.

"4th ult. The lot that is conceded to him being of fifty vares, conformable to the petition, he shall pay to Municipal Fund the tax corresponding with that established by edict on the matter, and this title having been delivered to the party interested, for the uses he may see fit, this concession is recorded in the proper book, in the Court of my charge, and the party above mentioned signed with me, this day of this date.

"FRANCISCO SANCHEZ.
PEDRO SCHERREBACH.
VICENTE MIRAMONTES.

"He that signs below, favored with lot, that is expressed in the precedent title of concession, declare before the present witnesses that I sold Davis, resident of Yerba Buena, the expressed lot, in the sum of fifty dollars, and that he may possess and occupy it with the corresponding security, I make a transfer of this document, which may be of service as a guard; and that it may be valid, I sign it before the proper witnesses, in the Port of San Francisco, on the 20th of April, 1843.

"FRANCISCO DE HARO.

"Witness: HINCKLEY.          Witness: W. G. RAE.

"I do certify the within and foregoing to be a true and literal translation of the original document in the Spanish language in my possession.

"MARTIN E. COOKE."

The certificate of Martin E. Cooke was objected to by defendant's counsel, but being offered by plaintiff's counsel, for the sole purpose of showing that said document was in existence during the lifetime of said Cooke, the said Court allowed the same to be read in evidence to the jury.

The plaintiff also produced a book in Spanish, called Spanish Blotter B., and introduced testimony tending to show that the said book came from the Recorder's office. of San Francisco County; that it was kept as a *toma de razon* or register of the Justices of the Peace and other magistrates in the pueblo of San Francisco, or Yerba Buena, in which they noted the concessions made by them; that Francisco Sanchez was Justice of the Peace in San Francisco, or Yerba Buena, in the year 1843, and Francisco De Haro was his official clerk; that all the entries in said Blotter B. in the year 1843 were in the handwriting of the said Francisco De Haro, except the numbers of the lots, respectively, which were in the handwriting of Washington A. Bartlett, and except a portion of the last entry under that year, which, being translated, is, "it being Lot No. 4 in the plan of Yerba Buena," and that portion was in the handwriting of Guillermo (William) S. Hinckley, that the said Hinckley, as Alcalde, succeeded to said Francisco Sanchez as Justice of the Peace in the year 1844, and that all the entries in said Blotter B for the year 1844 were in the handwriting of said Hinckley.   And as a part of the evidence of the plaintiff as to the handwriting of the various parts of said Blotter B, plaintiff offered Eugene Liés, Esq., as a witness, who testified that he had never seen or known Francisco De Haro, or said Sanchez, or Hinckley; that he had never seen either of them write, nor had corresponded with them, or either of them; but that he was in the habit, and had been for years, of examining the Mexican archives in California, and from that he knew the handwriting of said parties, and from having seen documents in the archives purporting to be the official papers of said respective persons. On the objection being made by the defendants, that he was not qualified to give his evidence of the handwriting of said persons, the plaintiff's counsel insisted that he was qualified

so to testify, and that knowledge of handwriting could be so acquired. The Court thereupon permitted the plaintiff to give such evidence of said Liés to the jury. Which Blotter B was read in evidence,. and a translation of the same is as follows, viz.:

"Blotter B.

"MAY 1st, 1839.

"Book containing the possessions of the building lots of the place 'Yerba Buena,' as directed by the Departmental Government.

"JANUARY 1st, 1840."

"It contains those granted in the establishment of Dolores at the instance of the Prefect of the District to the Government of the Department, as appears from the official note, which is on page second."

"JANUARY 1st, 1841.

"It contains the forms on the terms as possession was given to several, as directed by this Justice Court for its safety, in accordance with the laws. I, Francisco Guerrero, Justice of the Peace, ordered it decreed and signed, which I attest.

"FRANCISCO GUERRERO."

"Form in the way that possession of the building lots for erecting places of abode, has been given to the residents in the jurisdiction of San Francisco de Asis, and which is as follows:

"SAN FRANCISCO, &c., de &c., de &c.

"In view of the foregoing petition and superior decree of the Departmental Government, I, Francisco Guerrero, Justice of the Peace of this jurisdiction, do hereby give to so and so perpetual jurisdiction and lawful possession of a building lot of so many varas, under the following conditions:

"1st. That he shall, within the precise term of one year from this date, have the said lot fenced and build a house thereon.

"2d. That he shall conform absolutely with the police regulations established and to be established.

"3d. That the non-observance of the 1st article shall make the party interested forfeit his right to the lot; and by contravening the second article, he shall incur the penalties that may be inflicted to him according to law.

"And I grant him these presents to answer to him as the regular title of possession. Dated as above, the same having been recorded in the proper book of registry, which I attest, and reported to the Prefect of the 1st June, 1839.

"FRAN'CO GUERRERO."

"Lot 18.

"In the same form as above, possession was given to citizen Juan C. Davis of one building lot of a hundred varas on each side, N. S. E. W. according to the superior decree of the Departmental Government, bearing date the 12th day of November, 1839."

" Lot No. 7.

"SAN FRANCISCO, December 9, 1839.—Fran'co Guerrero do. do. do., to citizen Jacob P. Leese, by a superior decree of the Depart'mt Government attached to this petition, a lot of a hundred varas on each side, N., S., E., W.

"SAN FRANCISCO, Jan'y 15th, 1840.

"He did not pay the fees.

"FRAN'CO GUERRERO."

" Lot 3.

" As represented and admitted in the form as above, and with the foregoing requisites, a lot of fifty varas on each side, N., S., E., W., was given to citizen Juan Antonio Vallejo.

"SAN FRANCISCO, June 15, 1840.

"FRAN'CO GUERRERO."

" Lot 50.

"SAN FRANCISCO, January 15th, 1840.—On this date possession was given to citizen Juan R. Cooper of a building lot of a hundred varas on each of the four sides, as by a decree of the Departmental Government, preceding to his petition.

"FRAN'CO GUERRERO."

"Lot 23.

"SAN FRANCISCO, January 15th, 1840.—On this date possession was given to citizen Juan Vioget of a building lot for a hundred varas from N. to S. and fifty varas from E. to W., by the formation of street, as per the plan; he having an order as per the decree of the Departmental Government, preceding to his application, for a hundred varas square.

"FRAN'CO GUERRERO."

"OFFICE OF THE PREFECT OF THE 1ST DISTRICT.
"*Receipt Acknowledged.*

"The Secretary to the Government of this Department, under date of the 16th inst., stated to me the following:

"When Mr. José Castro, the Prefect, made a visit to the northern places, he carried instruction from the Government for several matters; and by those instructions he was ordered that building lots might as well be granted to private individuals in the establishment of Dolores; but that they should not exceed fifty varas; and such was the direction, and now the same is given again, for which purpose H. E. has seen the note addressed by this Prefecture to this Secretary on the 6th inst.; and H. E. directed me to state that your Honor may as well warn the Justice of the Peace of San Francisco that on making the concession of building lots it should be in a passable, orderly manner, and as required by the locality of the place, so that the streets and squares to be formed may under a footing have proper order.

"I hereby communicate the same to you for your knowledge and compliance, and as the consequence of his communication bearing on this subject.

"God and Liberty. San Juan de Castro, April 23d, 1841.

"JOSE Y CASTRO.

"To the Justice of the Peace of San Francisco."

"Lot 36.

"SAN FRANCISCO, August 4th, 1840.

"On this date possession was given to citizen Gregorio

Escalante of a building lot of fifty varas, according to the plan thereof in the same form.

"FRAN'CO GUERRERO."

"Lot 19 and 19¼.

"SAN FRANCISCO, December 1st, 1839.

"Mr. Guillermo Hinckley was granted a building lot-of a hundred varas from N. to S., and fifty from E. to W., by the formation of street, for a mill and saw-pit, by a superior decree of the Departmental Government preceding to his petition, and it is as follows: Monterey, November 21st, 1839. While the machine that the party interested in this petition seeks to establish shall remain thereon, he shall be allowed to occupy a hundred-vara lot in the place Yerba Buena, and for this purpose he shall apply to the Justice of the Peace of San Francisco to make the proper measurement; under the understanding that the moment the said lot be not occupied with the said machine, it shall remain for the benefit of the nation for other useful purposes. Don Manuel Jimeno Casarin, first constitutional member of the Honorable Departmental Board of the Californias, in trust of the Government of the same, thus ordered and signed it, which I attest.

"MANUEL JIMENO.

"FRAN'CO C. ARCE, First Clerk."

"Mr. Guillermo Hinckley, having appeared in this Justice Court, his application was returned to him after it had been recorded. Dated as above.

"FRAN'CO GUERRERO."

"SAN FRANCISCO, November 18th, 1840.

"As presented and admitted, a building lot, as solicited, for fifty varas, is granted to the party interested *ad perpetuum,* under the following conditions:

"1st. That he shall, within the precise time of one year from this date, have the said lot fenced, and build a house thereon.

"2d. That he shall conform absolutely with the police regulations established and to be established; be subject to pay such tax as he may be liable to, according to edict on

the subject, in case it be so determined by the Government. The same having been already consulted.

"3d. The non-observance of the first article will cause the party interested to forfeit his right to the lot; and by his contravening the second article, he shall incur the penalties that may be inflicted according to law.

"And for the purpose of these presents may answer him as the regular title of possession, as directed by the Departmental Government, I grant him the same date as above. It having been registered in the proper book of registry.

"Which I attest.

"By virtue of Mr. José Castro, the Prefect, having communicated, when he went up to the northern places, to this vicinity, a note from the Departmental Government, wherein the Government concedes that building lots in the Establishment of Dolores may be granted to several, I solicited a copy of said order from the Prefect *ad interim*, Mr. José J. Castro, it being the foregoing, and by virtue thereof, and in the way and form as above stated, possession of a building lot of fifty varas was given to citizen Candelario Valencia.

           "Fran'co Guerrero."

"San Francisco, November 18th, 1840.

"On the same terms of the above form, possession of fifty varas was given to citizen Leandro Galindo, in the Establishment of Dolores, by a superior order as preceding. Date as above.

           "Fran'co Guerrero."

"San Francisco, November 18th, 1840.

"I, Francisco Guerrero, Justice of the Peace, by virtue of what has been already ordered, and in accordance with what has been already established, gave possession of a building lot of fifty varas to citizen Felipe Gomez, in the Establishment of Dolores. The Major-domo and witnesses being present. Dated as above.

           "Fran'co Guerrero."

"San Francisco, June 28th, 1841.

"I, Francisco Guerrero, Justice of the Peace of the juris-

diction of San Francisco, by virtue of the direction of the superior authority, gave possession of a building lot of fifty varas, to the citizen Francisco DeHaro, and as since the time of the late Figueroa, Political Chief and Commanding General of the Department, Mr. Ignacio de Valle, being a commissary of the establishment of Dolores, had an order to the effect that fifty varas might be granted to him; and he having verified in this Justices's Court the fact of its having been so granted to him, I gave him possession of fifty varas more, which, from the irregularity of the position of the land, could not be a hundred square varas, and it forms a unilateral figure of the base of seventy varas, and a hundred on the S. N. and W. sides, and the thirty varas short were given on the W. side, forming a triangle with the base of one of the hundred-vara sides, and the perpendicular of thirty varas being closed by the hypothenuse; thus it embraces a hundred-vara building lot, and it having been measured, the party agreed thereto.

"Witness—Jesus Noe and Mr. Augustine David, the Measurers, the Steward of the establishment, Mr. Tiburcio Vasquez.

"Which I attest.

"Fran'co Guerrero."


"San Francisco, February 28th, 1841.

"Mr. Juan Vioge having appeared in this Justice's Court under my charge, applying for a license to open a billiard house and hotel in the place Yerba Buena, the same was granted to him; the party being subject to the payment of the taxes established by the edict on the subject.   Date as above.

"Fran'co Guerrero."


"Establishment of Dolores, March 8th, 1842.

"In accordance with the Superior Decree of the Prefect of the District, of the 2d March, 1842, which goes with the petition presented to that authority, under date of the same month, by Mr. F. M. F'co. Guillermo Hinckley, I put in possession of a building lot petitioned by the said party

this day of the date, giving him for his safety a correspondent title of possession.

"Dated *ut supra.*"

## "Lot 21.

"ESTABLISHMENT DOLORES, March 8th, 1842.

" Mr. George Allen having petitioned the Prefect of the District in his petition of the present year for a building lot of fifty varas, in the place Y Bun (Yerba Buena), by a decree of that authority of      of the said year, the same was granted to him; and according to the direction, he was put in possession. Record thereof being entered in this book, of said grant."

## "Lot 20.

"ESTABLISHMENT DOLORES, May 1st, 1842.

" Pedro Sherreback, a native of Denmark, and Mexican citizen, having petitioned the Superior Government of the Department for the concession of a 50-vara building lot, in the place Yerba Buena.

"In pursuance of the Superior Decree of the 3d of April of the present year, which is attached to his petition, the same was granted to him, and he was put in possession thereof, which is recorded this day's date."

### "In the year 1843."

## "Lot 55.

" On      day of April of the present year, Mr. Vicente Miramontes was granted a building lot of 50 varas square, in the place Yerba Buena, and he was put in possession of the same, exhibiting (giving) to him the corresponding title."

## "Lot 31.

" On      of April, of the present year, Mr. Francisco DeHaro was granted a building lot of 50 varas square, in the place Yerba Buena; and he having been put in possession he was exhibited (given) the correspondent title."

There were in said Blotter B a large number of entries similar to the last above given extending up to the middle of the year 1846. The defendants objected to the entries in Blotter B other than the last one above, being the lot

in controversy, because they were not the grants themselves, and the book was but secondary evidence, and that no foundation had been laid for it by showing the grants themselves. The objections were overruled. The plaintiff read in evidence the deposition of Gorham H. Nye, who was a seafaring man, and testified that he sailed from San Francisco to San Diego with vessels, and among others, brigs "Fama" and "Boliver Liberator;" and that he sailed the latter vessel in 1843 and 1844, and met Sill in San Francisco in 1843 and 1844, and that Sill worked on board his vessel carpentering and blacksmithing, and that he saw Sill at work blacksmithing in his own ship on the demanded premises, in 1843 and 1844. The witness said he knew John Davis, who had a shop on Washington Street, east of the demanded premises, and that one John Finch worked for Davis in 1841–2, and up to the latter part of 1844, or first part of 1845. The plaintiff also offered parol testimony tending to show that Sill, said Finch, and one Westgate, worked at blacksmithing in the shop on the demanded premises in 1843 and 1844. Hinckley died June 30, 1846, De Haro in 1848, Guerrero in 1852 and Ridley in 1851. The trial, took place in July, 1868.

The defendants introduced testimony tending to show that on or before March 1, 1844, Sill sold his interest in the demanded premises to George Davis, for the sum of $50, and that Sill told Davis the title was not vested in him, as he had no paper title, but in De Haro, and that he would cause De Haro to make the proper transfer, and that Davis, Sill and Hinckley, who was then Alcalde, went to De Haro to have De Haro make the transfer, and by the advice of Hinckley, with the consent of Sill, in order to extend the time for complying with the conditions of the former grant to De Haro, made by Sanchez in 1843, De Haro petitioned Hinckley anew for the lot, and Hinckley, on the 3d of March, 1844, granted the lot to De Haro, who endorsed on the same "a sale to Davis." The following is a translation of the petition, grant and sale by De Haro:

" *To the Alcalde of 1st Nomination:*

"I, Francisco De Haro, a resident of the District under your jurisdiction, in due form represent to your Honor, that having to build a house in the place of Yerba Buena for my establishment and settlement at that point, and needing for this purpose a house lot, I apply to your Honor, to the end that in the exercise of your authority you may be pleased to grant me, in ownership, a lot fifty varas square, of those that are shown by the map of the town (poblacion) to be vacant contiguous to the Plaza. Wherefore, I pray your Honor to proceed as may be just upon this my petition, which I make on common paper, there being no sealed paper.

"Swearing to what is necessary, &c.

"SAN FRANCISCO, March 1st, 1844.

"FRANCISCO DE HARO."

"SAN FRANCISCO, March 3d, 1844.

"The foregoing petition being presented and admitted, in view of what the petitioner asks for therein, I, the Alcalde of First Nomination of this jurisdiction, Guillermo Hinckley, by virtue of the authority which has been conferred upon me in relation to the matter, grant him the lot for which he petitions; and to the end that he may possess the same legally, and make such use thereof as he may deem proper, I adjudicate the same to him in property by this title, and place him in juridical possession thereof for his security, subject to the following conditions:

"1st. That within the term of one year, counting from the present date, he shall enclose the lot, and have a house built thereon.

"2d. That he shall conform in all things to the decrees and regulations of policy which have been or may be established.

"3d. If he fail to observe the 1st article of these conditions, he shall lose his right to the lot; and if he violate the 2d, he shall incur the penalty attached to such violation.

"4th and lastly. That he shall pay into the municipal

fund the tax imposed by the decree in relation to the matter, for the lot which is granted.

"And this title having been delivered to the interested party for the uses that may be necessary, the same remains registered in the respective book in the Juzgado. The Alcalde signed, with the assisting witnesses.

"GUILLERMO HINCKLEY.

"  "Assist:                              "Asst.:

"ROBERT T. RIDLEY.              JOSE DE JESUS NOE.

"Municipal Tax,

  "$12.50."

"I, the undersigned, grantee of the lot described in the foregoing title of concession, declare before the present witnesses that I have sold to Don George Davis, a resident of Yerba Buena, the said lot for the sum of ($50) fifty dollars; and in order that he may possess and occupy the same, with the corresponding security, I deliver to him this document, which shall serve him as a security; and in witness whereof, I sign before witnesses, in San Francisco, on this 28th of March, 1844.

"FRANCISCO DE HARO.

"  "Asst.:                                 Asst.:

"ROBERT T. RIDLEY.              JOSE DE JESUS NOE."

The phrase in the original of said petition which is translated "contiguous to the Plaza," being written in the original Spanish, "immediato a la Plaza." Upon the back of the same paper (which was all one sheet) containing the the petition of De Haro, concession of Hinckley, and transfer by De Haro to George Davis, was a paper transfer from John Finch to John Thompson, in words and figures in Spanish, of which the following is a correct translation, viz:

"I, the undersigned, being the legal owner of the lot mentioned in this title of concession, having purchased the same from Robert Livermore, as is shown by a document of sale in my possession, signed by said gentleman, on this day I have sold to John Thompson the one half of all my right and property in the said lot for the sum of one hun-

dred dollars, which I have received; and I obligate myself to defend the said John Thompson, his agents or heirs, against any claim that may be made or set up against said lot; and in witness whereof, I sign this in the presence of witnesses.

" YERBA BUENA, April 26th, 1845.

" JOHN FINCH.

" Witness:

"GUILLERMO HINCKLEY."

And defendants offered evidence tending to prove that the names of " John Finch," signed to the last named paper as principal, and " William Hinckley," as witness, were each the genuine signature of said Finch and Hinckley, respectively.

The defendants also produced a copy of the original Spanish of the petition by De Haro to said Hinckley, the concession or grant by said Hinckley to said De Haro, and the transfer by said De Haro; there was, also, written upon the same (the whole being contained on one sheet), a writing purporting to be a duplicate original of said transfer from Finch to Thompson, in the same words and figures as above shown, with the names of John Finch and said Hinckley, respectively, as principal, or maker, and witness; and there was subscribed at the bottom of said writings the following certificate, written in Spanish, viz:

" I, the undersigned, certify that the foregoing is a literal copy of the original. Date as above.

" WILLIAM HINCKLEY."

Also introduced testimony tending to show that the same was in the handwriting of the said Hinckley, except the signature, "John Finch," to said paper, dated April ?6th, 1845, concerning which, evidence was offered tending to show that the same was the genuine signature of said Finch, and then proposed to read the same in evidence to the jury, for the purpose of showing that the same was in existence during the lifetime of the said Hinckley. The plaintiff objected, on the ground that the genuineness of a disputed original could not be shown by introducing a disputed copy

in evidence, but there was no evidence offered on the part of the plaintiff, tending to show that the signature of Finch was not genuine, nor that the other parts of said last named documents were not the genuine handwriting of said Hinckley, or that they were not made at the time, but on the evidence, the plaintiff's counsel disputed the signature of said Finch. The Court overruled the objection.

The defendants also offered evidence tending to show-that said Finch derived title to lot 31, from said Davis, after Davis purchased from Sill, and that the lot being vacant, Finch went into possession in 1844, and built a house and blacksmith shop, and continued to occupy the same until his partnership with Thompson, and afterwards jointly with Thompson, until his death in the year 1847, and that the foregoing sale by Finch to Thompson, was in duplicate, and also an agreement interchangeable with Thompson, of which the following is a copy:

"Know all men by these presents, that on this day John Finch and John Thompson, both residents of Yerba Buena, have entered into partnership under the following condition:

"1stly. Said Finch sells unto said Thompson one half of his right and title in and upon a piece of land now occupied by him, as also one half of the house and of all property at this time existing on said land.

" 2dly. Said Thompson, for and in consideration of said transfer of property, will pay to said Finch the sum of three hundred dollars, to the satisfaction of the aforesaid, being in full for all right and title now granted.

"3dly. It is agreed on both parts, to prosecute the business from this date jointly, and each one binds himself by these presents, to do all in his power for their joint interest.

"4thly. In case of the death of either of the parties, it is agreed that all property existing shall belong to the survivor.

"5thly. In case of either party wishing to dispose of his interest in the premises, the other party shall have the refusal of said half.

"6thly. In case of disagreement, it is agreed to abide

by the decision of two disinterested persons, without recourse to law.

"In testimony whereof, we mutually place our hands and seals, this twenty-sixth day of April, 1845, and in duplicate.

"JOHN THOMPSON.
"Witness, GUILLERMO HINCKLEY.          "JOHN FINCH.

"Recorded in the County Recorder's office, San Francisco, January 20th, 1855, at 2 P. M. in Liber C of Miscell's, p. 494.

"JAMES GRANT, County Recorder."

And that when said Thompson entered into the agreement of co-partnership with Finch, he found that said Finch had in his possession, as his title papers and among others, said petition of DeHaro to Hinckley, said grant by Hinckley to DeHaro, and said paper transfer of DeHaro to George Davis; and that upon the death of John Finch, in 1847, Thompson claimed the said property, in right of survivorship, and that he continued to occupy the same, and to carry on the business thereon of blacksmithing, selling liquor, and keeping a bowling saloon; and that in the year 1848, he sold out one half of said land and premises to one Stephen A. Wright, and that he and said Wright occupied the same, by themselves and tenants until 1849, when they sold to divers persons who occupied the same until they sold to defendants, Reese and Guy.

The defendants gave further testimony, tending to show: that one John C. Davis and said John Finch had been in partnership in business, principally blacksmithing, upon lot No. 18, in Yerba Buena, being the next lot easterly of the lot in controversy, up until about June or July, 1844, about which time their partnership was dissolved, and that a settlement and adjustment of accounts was then had between them, and that partnership articles were then entered into between John C. Davis and said Reynolds and Rose; and that they thereafter carried on upon said lot 18, the business of blacksmithing, ship-building, carpenter work, etc. That they built for said Finch a house upon the lot

in controversy, but that while Finch was charged for the articles by John C. Davis & Co., (composed of said Davis, Rose & Reynolds), yet it was done by said John C. Davis & Co., for Finch, in payment of moneys due on settlement from Davis to Finch, and that Davis settled the same with Reynolds and Rose.

The defendants then asked the said John Rose, who was on the stand as a witness, called by them, the following question:

"Did John C. Davis, at the time of the dissolution, state the state of the account between him and Finch?"

The plaintiff objected to this question, on the ground that the declaration called for would be only hearsay, and not evidence between the parties to this action, but the Court overruled the objection, the plaintiff excepted, and the question was put to the witness. The witness answered as follows:

"I don't know that I can say exactly. The substance was, that he had agreed to pay Finch a certain sum of money, and the house was to be built by us—Davis, Reynolds and myself—for Finch, and charged to Mr. Davis. He had necessarily to tell me of this, before the material was used for that purpose. As to the exact amount, I don't know how I became possessed of the fact, or in what way. I seem to know now that it was about $1,000, but whether Davis told me the exact amount or not, I cannot say."

Further evidence was given by the defendants, tending to show, that the said John C. Davis & Co. did, in the fall of 1844, build for said Finch, upon the lot in controversy, a house and blacksmith shop, and furnish the materials and labor therefor, and certain blacksmith tools, and other articles, to the amount of about $1,000; and that the whole was furnished to said Finch by said John C. Davis, through said firm of John C. Davis & Co.; and that said Davis settled with his said firm for the same; and upon these matters there was no conflict of evidence.

Plaintiff moved to strike out this answer. The motion was denied.

The defendants also produced certain books of account,

and introduced evidence tending to show that they were the day-book and journal of John C. Davis & Co. (composed of said Davis, Reynolds and Rose), kept by them in the usual course of their business in the years 1844, 1845 and 1846; that Davis was bookkeeper in said business, and died in the year 1848; that the following entries in said books were in the handwriting of said John C. Davis, and then proposed to read to the jury from said books a certain account therein entered against said John Finch, in the words and figures following, viz.:

Mr. John Finch
　1844.

| Sept. 20th—From Captain Wilson the amount of | 136.34 |
| " ship Vandalia | 119.62 |
| 1 ring and hook | 1. |
| 1859 feet lumber at $45 | 83.50 |
| 3 pair hinges at $2\frac{1}{2}$ | 7.50 |
| 100 wood screws | 2.00 |
| Nails 22 lbs | 8.25 |
| 4500 shingles at 7 | 31.60 |
| &c., &c., &c. | |

The plaintiff objected to the reading of said entries to the jury, on the ground that the entries, not being in the handwriting of any witness at the trial, were not evidence of any material fact, but only hearsay; that the same were not such memoranda as could be read in evidence for or against the parties to this action; and that the same were in favor of and not against the person making them; but the objection was overruled.

　The defendants also proposed to read to the jury the following entries from said last mentioned account book of John C. Davis & Co., after having proved that said entries were made in the usual course of business, by said John C. Davis, and in his handwriting, namely:

Oct. 3d, 1844.
　Capt. Nye, Fama.

| Rep chain plate new bolts 17 lbs | 6.60 |
| 2 days' work | 7.00 |
| Pine and nails | 00 |

Nov. 22, 1844.

   Ship Fama.

| | |
|---|---|
|         3 jack stayes | 4.00 |
|         Nails | 1.25 |
|         2 Thimbles | 1.50 |

Dec. 2.

   Ship Fama.

| | |
|---|---|
|         1 plate 3 Flock and nails | 1.00 |

Dec. 9.

   Ship Fama.

| | |
|---|---|
|         1 lamp stand | 1.00 |
|         4 Thimbles 6 Fl 2 rugs | 2.00 |
|         1 clamp | 1.50 |

These entries were offered to show that the witness Nye was mistaken in the time he saw Finch in the shop of Davis & Co., and also in the time he was in San Francisco and saw Sill.

The plaintiff objected to these entries being read to the jury, on grounds: First—That they were hearsay. Secondly—That they are not competent evidence to prove a fact against the plaintiff, neither he nor those under whom he claims being a party to the transaction. Thirdly—That they are not evidence in this action to prove the collateral fact for which they are introduced. Which objections the Court overruled.

The defendants produced a certain account book, and having introduced the testimony of one William H. Davis, tending to show that the account book was the book kept by one Nathan Spear, now many years deceased, in his business as a merchant in Yerba Buena, and that said W. H. Davis was his clerk in said business, and as such kept the said book and made all the entries therein at the respective times of their dates, and of the happening of said transactions, and in the usual course of the business of said Spear, in his own handwriting, and that the entries made in said book were correct as there entered, and that said Francis Westgate, and said Finch, Sill and John C. Davis had worked together in blacksmithing

on the lot of said Davis, No. 18, lying in the block bounded by Washington, Montgomery, Kearny and Jackson streets; and that said Westgate left San Francisco in the year 1841, after closing up his business there, and never again returned. The defendants then proposed, for the purpose aforesaid, to read from said last mentioned account book, to the jury, the following entries therein, namely:

YERBA BUENA, Oct 25, 1839.

John Finch, Cr.,

| | |
|---|---|
| By 1 ps nankeen | 3.00 |
| " one-third blksmith shop concern | 41.50 |
| | 44.50 |

Daniel Sill, Cr.,

| | |
|---|---|
| By one-third blksmith shop concern | 41.50 |
| " amount of John Davis & Co. | 189.50 |
| " 8 days labor | 16.00 |
| | 246.62½ |

John Davis & Co., **Dr.**,

| | |
|---|---|
| To amount Daniel Sill, | 189.12½ |

John Davis & Co., Cr.,

| | |
|---|---|
| By amount John Finch | 23.81¼ |

John Finch, Dr.,

| | |
|---|---|
| To amount John Davis & Co. | 23.81½ |

Nov. 11th, 1839.

Francis Westgate, Cr.,

| | |
|---|---|
| By his share blacksmith shop concern | 38.50 |

The plaintiff objected to the reading of these entries, or any of them, to the jury, on the grounds: First, That the entries were mere hearsay, and between third parties. Secondly, That they are not such entries as the witness could refer to as memoranda. Thirdly, That the party who made the entries is here on the stand, and can testify as to the facts. Fourthly, That they were not against the interests of the parties making them. Fifthly, That said entries are only secondary evidence in any aspect of the question.

The Court overruled the objection.

The--defendants, in order to prove the signature of Francisco De Haro to the petition for the said alleged concession of 1844, and to the said alleged grant by Francisco De Haro to George Davis, called several witnesses, whose evidence tended to prove the genuineness of the signature of said De Haro to said petition and grant, and among others of said witnesses was R. C. Hopkins, who testified that he had been for fifteen years, and still was, the official keeper of the Mexican archives in California, in the office of the Surveyor-General of California, and that, as such, he knew the signature of said Francisco De Haro, from having consulted official documents from said De Haro as a Mexico-California official; that the archives in his charge contained several hundred official documents and signatures of said De Haro; that his correspondence, as an official, had been, as shown by said archives, quite voluminous, and had been carried on with numerous officials of the Mexican Government, and that the correspondence to and from him, and numerous official documents from said De Haro, were contained in and preserved in said archives, by the United State Government, as the genuine documents of said De Haro; and that ever since his connection with the archives, the witness had been familiar with the handwriting and signature of said De Haro; and, also, that he had examined said Blotter B, and had seen and recognized the handwriting of said De Haro therein contained; and that from his knowledge of the handwriting and signature of said De Haro, so derived from his familiarity with the said Mexican archives, and the documents therein contained, he could tell, and was acquainted with the handwriting and signature of said De Haro. That he was in the habit of examining the archives, and had been for years, for the Government officials, and had done so in numerous cases where suits were pending involving the genuineness of paper writings, and had frequently been employed, for many years past, by various members of the bar of San Francisco, both in the State Courts and the United States Courts, to examine the archives, and ascertain what might be therein contained bearing upon suits pending; that said archives contain a

vast number of documents, and many not easily found by persons not familiar with them.   That his duties were and are to keep safely the said archives, and make search and give information to the Government officials, but not for private persons; but that he had frequently been employed by private persons to make searches and give information, for reasonable compensation for his labor.   On cross-examination, he stated that he never knew said De Haro; never saw him write, or had any correspondence with him, but that he had made actual comparison of the said alleged signature of Francisco De Haro, by laying them down beside his signature to such official documents in witness's custody, purporting to be genuine, for the purpose of testifying in this case, but that independently of such comparison, he had no knowledge of the handwriting and signature of said De Haro, derived from his general knowledge, prior to such comparison of his handwriting as contained in the archives, and that he made such comparison merely to test in his own mind the accuracy of his opinion of such handwriting, he having testified upon a previous trial of this case.

The question was then put to the witness whether, in his judgment and opinion, he considered the said signature of Francisco DeHaro to said petition and grant was genuine ?

The plaintiff objected to this question on the following ground :

That he is not the best witness, as there are living witnesses who have seen said Francisco De Haro write, and who can be produced.

That handwriting cannot be proved by actual comparison with these documents not admitted to be genuine.

The Court overruled the objections.

The defendants likewise offered evidence tending to show the genuineness of the signatures of said Hinckley, Noé and Ridley to said concession or grant, and of said Noé and Ridley to said transfer from said De Haro to said George Davis; and that said papers were, on the 26th day of April, 1845, in possession of John Finch, who claimed them to be his title papers to said lot in controversy, and that they

passed, on his death, to said Thompson, and so on from one grantee to another, until they reached the present defendants.

The plaintiff having introduced evidence that Sill did in the years 1844, 1845, 1846 and 1847, carry on the business of keeping a bowling alley upon the lot in controversy, and that Finch was a hired hand, or employee of said Sill, on said premises; and that Sill alone occupied the lot in controversy, during said years; the defendant offered evidence tending to show, that in the year 1846, Finch and Thompson built a bowling alley on said lot, as their own, and for their own use. The defendants also, after introducing testimony tending to show that all the signatures to the same were genuine, offered to read in evidence to the jury, papers in Spanish, all written on one sheet of paper, of which the following is a translation:

"To the Justice of the Peace:

"We, John Finch and John Thompson, both residents of this place, before Your Honor, in due form, represent: That we have commenced and are about to finish a bowling alley, and needing a license to use the same, we hope you will be pleased to grant us said license, offering to subject ourselves to the conditions and regulations that may be deemed just to impose upon us, in consideration of a proper regard for the public.

"Wherefore, we pray your Honor to be pleased to grant our petition, providing thereon in accordance with justice; admitting this on common paper, since there is no sealed paper; swearing to what is necessary.

"Yerba Buena, June 10th, 1846.

"John Thompson.
"John Finch."

"Office of First Justice of the Peace of Yerba Buena.

"The foregoing petition being admitted in view of what the petitioners therein pray for, I, the citizen José de Jesus Noé, First Justice of the Peace of this Jurisdiction, and in consideration of the circumstances recommending said pe-

titioners, I caused to appear before me the citizens, John Davis, John Cooper, Pedro Sherreback, and Jacob Dopkin, whom I examined as immediate neighbors, if they approved of the construction of the bowling-alley, which was being made in the house of Señores Juan Finchar and John Thompson, or if the same would incommode them; to which they responded that they would not be molested thereby, and that the same could be finished; and for their security, they signed the same with the present Judge; the interested parties being subject to the police regulations which have been or may be established for the good government of the place; and to the end that the beneficiaries may have the proper security, this document is returned to them, the same remaining registered in the respective book of entries, for the ends that may be necessary. Thus I ordered and signed in Yerba Buena, on the 16th of June, 1846.

"J. De Jesus Noe.

"Pedro T. Sherreback,　　　John C. Davis,
"Jacob Dopkin,　　　　　　John B. Cooper."

The plaintiff objected to these papers on the ground: First, that it was hearsay and incompetent evidence; secondly, that the petition was the declaration of the parties themselves as to whose the house was.

The Court overruled the objection.

A book called "Book A, of Original Grants," was then produced by the defendants, who introduced testimony tending to show: That the said book came from the Recorder's office of San Francisco County, and from the custody of said Recorder; that the same was a book instituted by Washington A. Bartlett, Alcalde in the year 1846, in which to enter grants of land made by him as such Alcalde, and also to copy such grants, made previous to the conquest of the country by the Americans, as should be brought to him for that purpose, upon a notice to that effect theretofore issued by him, in order that he might know what lots had been granted; and that many persons procured their grants to be recorded in said book, whilst others withheld them; and that in that book there were entered what purported to

be copies of concessions made by Francisco Sanchez, as Justice of the Peace, in 1843, which were not entered on "Blotter B;" and also what purported to be copies of concessions made by other Alcaldes and magistrates, after Hinckley's term, in 1844, which were not entered in "Blotter B."

The plaintiff objected to this: First—As not being evidence for any purpose. Secondly—As raising collateral issues as to the genuineness of these supposed concessions, so purporting to be copied in said book. Thirdly—That the originals should be produced if the evidence was receivable at all.

The Court overruled the objection.

The plaintiff had, in his opening case, offered evidence tending to show, that one Henry Bee had obtained a grant or concession of a lot, from said Francisco Sanchez, as Alcalde, in the year 1843, and that the same had not been entered in Blotter Book B, nor any memorandum of the same made therein; and it also appeared from plaintiff's evidence that a lot, in 1844, was granted to one Briones, which was not entered in Blotter B; and that one Padilla had been Alcalde in the year 1845, and made grants of lots, but he made no entries of any grants or concessions in said Blotter B, or any book ever found or known.

The defendants produced a book entitled "Index to holders of lots in the town of San Francisco," and introduced evidence tending to show it came from the office of the County Recorder; that it was instituted in 1846, and kept by said Bartlett, as Alcalde, in the Alcalde's office, and was transmitted by him to his successor in office, and passed successively to the different Alcaldes; that it was an official book, kept by said Alcaldes to enable them to know in their said office what lots had been granted, and who the subsequent claimants were, to avoid confusion and conflict in making new grants; that each lot was numbered in its order on said Index book, and the various entries concerning such lot, made by the Alcalde opposite the lot, and that the writing in said Book was made by the different officials,— by Bartlett, first Alcalde, by Bryant, Hyde, and Leaven-

worth, and sometimes by the clerks of the Alcaldes; that after said Bartlett issued his notice or proclamation, calling upon all persons to produce their grants or concessions and transfers, in order that a copy, note, or memorandum should be made by the Alcalde of the same; that Bartlett would talk with people and get what information he could from them, and from other sources, and then make entries in said Book; the said Thompson and Finch produced their title papers, under which they claimed said lot in controversy, to said Bartlett as such Alcalde, and requested him to record the same; that the papers produced to him, were, among others, said petition by De Haro to said Hinckley, and said grant by said Hinckley to said De Haro, and said transfer by said De Haro to said George Davis; and that said Bartlett received said papers for that purpose. In said Index Book, were found the following entries, in the handwriting of said Washington A. Bartlett, viz:

"Lot No. 31.

"Lot No. 31, fifty varas square, Thompson and Finch, originally granted to Francisco De Haro, April, 1843, who sold to Geo. Davis, who sold to Robt. Livermore, who sold to John Finch, who, with his partner, John Thompson, were in possession July 9th, 1846.

W. A. B."

The defendants then offered to read that entry in evidence to the jury, to which the plaintiff objected, on the grounds:

First—That it was a merely private memorandum book of the Alcalde. Secondly—That it was not authorized or required to be kept by law. Thirdly—That it was not an official book. Fourthly—That it was *ex parte* and hearsay. Fifthly—That it came to the hands of the Recorder from private hands. Sixthly—That it was not found in any public archives. Seventhly—That it had never been decided to be a book of record. Eighthly—That it purports on its face to be only an index to holders of lots in San Francisco. And the plaintiff's counsel read to the Court the following, written on the blank leaf, in the back part of said Index Book, viz.:

"(Copy of receipt to J. D. Bristol.)

"SAN FRANCISCO, October 22d, 1861.

"This is to certify that this Book, entitled an 'Index to holders of lots in the town of San Francisco,' containing also a copy of a marriage certificate between J. Henry Brown and Hetty C. Pell, dated October 30, 1846, was received this day from J. D. Bristol, he desiring that if said Book should be decided to be a book of record, that the same should be kept in this office, and if decided not to be a record, then and in that event, to be returned to him or his order.

"(Sd.)                               T. YOUNG,
"Hall of Records.                    Co. Recorder.
                    "Per T. A. MORGAN, Deputy."

The objections were overruled. Plaintiff's counsel also, at the same time, read to the jury the following written in pencil, in the handwriting of said Bartlett, in the midst of the other entries opposite lot No. 31, "I consider their title defective."

The defendants also produced testimony tending to show, that after 1850, Sill never made application to the occupants of lot 31 of the persons who had succeeded to the possession of the same, under the said John Thompson; and defendants offered evidence tending to show that Sill, went, in the spring of 1844, to Lassen's ranch, in this State, to reside; that he resided there until his death, in 1862, except that, in the year 1849, he visited the Atlantic States, and returned again to Lassen's ranch in 1850. The defendants then rested.

The plaintiff then introduced testimony tending to show that Sill lost his alleged title papers as early as the year 1847, and went to the Atlantic States in the year 1849, and did not return to California until the year 1850.

The plaintiff offered to introduce testimony tending to show that Sill, after his return to California in 1850, made application in San Francisco to one Joseph L. Folsom, a captain in the U. S. army, who came to California in the year 1846, and had since then resided in San Francisco,

and was then a large landholder under Alcalde grants, for advice in relation to the recovery by him of said lot 31.

The defendants objected to this testimony as not being in rebuttal, and as otherwise incompetent. The objection was sustained.

The plaintiff gave evidence tending to show that the Spanish word *plaza* meant "plaza," or public square, and that the word *playa* meant *the beach*, or shore of the bay, and that the plaza lay to the south of the lot in controversy; some of the plaintiff's witnesses located the beach or shore at some distance from the lot in controversy, whilst others of plaintiff's witnesses gave evidence that the waters of the lagoon came up close to the lot in controversy, and that the house on said lot was the nearest house to the waters of the lagoon, in 1847; whilst other witnesses for plaintiff testified that the said waters came up to and upon the said lot in question; and plaintiff also gave evidence tending to show, that for several years both before and after the alleged sale by said Sill to said George Davis, Sill claimed an interest in a lot situated on what is the north-west corner of Montgomery and Washington streets, being lot No. 4; but no evidence of title in said Sill was shown, nor was any evidence offered tending to show any title in said lot, except that he claimed an interest in it; nor was any given tending to show any sale by Sill to George Davis of said lot No. 4, or any interest therein; but defendants offered proof that said lot had been granted on the fifteenth day of November, A. D. 1843, by Francisco Sanchez to Francisco Guerrero, and that the same was transferred by said Guerrero, in writing, on the fourth day of August, A. D. 1844, to Robert T. Ridley; and was, on the third day of February, A. D. 1847, transferred by said Ridley to John C. Davis, John Rose and William J. Reynolds, and by said Reynolds and Rose conveyed to John C. Davis; and that the same, on the death of said Davis, descended to his children, who were in possession by their tenants. Said lot No. 4 stood upon the shore of the said lagoon, and extended partly into its waters; and no proof was offered tending to show any claim of said De Haro to, or upon said lot No. 4, or that

he had, at any time, any connection with lot No. 4; but proof was given, showing that said De Haro never had granted to him, nor had he any title to, or claim upon, any other lot in Yerba Buena, than said lot No. 31.

The plaintiff insisted and urged to the jury that the word " plaza," appearing in the said petition to Hinckley, as Alcalde, by Francisco De Haro, being dated March 1st, 1844, was originally written "playa" (beach), and afterward altered to "plaza," and that such alteration was perceptible to them by their own ocular inspection, without the aid of experts; but no note of any alteration appeared upon said last mentioned concession, or upon the said petition made therefor, or upon any paper connected therewith, or in evidence in any manner; and no experts were offered upon the same; but the Court permitted the jury to inspect and examine the petition, and to judge for themselves.

The plaintiff asked the Court to give the following instructions to the jury, which the Court declined to give:

9. "That the jury may determine for themselves whether the disputed word in the alleged petition of De Haro to Alcalde Hinckley, in the year 1844, was originally written playa or plaza."

11. "That entries of the names of persons upon the lots on the maps produced in evidence are not conclusive evidence of ownership, and are of no effect whatsoever as evidence of ownership, if the jury believe, from the evidence, that the officers placing them there were deceived or mistaken as to the fact of ownership, or that they were placed on such maps by persons other than the official custodians thereof."

24. "If the jury find that 'Blotter B,' from the Recorder's office, constituting what is called a 'Book of Possessions of Lots in Yerba Buena,' or San Francisco, including the year 1844, shows that the Alcalde of that year, William Hinckley, made an entry of fourteen lots only, as granted by him in that year; and there being no record evidence offered showing that he made any other than the fourteen grants therein named and numbered, and that

neither of said fourteen grants is the one in controversy; and that the said Hinckley was not Alcalde in any other year than the said year of 1844, the presumption is that he did not legally make any other grants than the fourteen named, and that he did not, during his official existence as Alcalde, legally make the grant bearing date March 3, 1844."

The defendant recovered judgment, and the plaintiff appealed. The other facts are stated in the opinion. A reference to the briefs of counsel will be necessary to get a clear explanation of the reasons for admitting and rejecting testimony.

*John W. Dwinelle* and *W. W. Chipman,* for the Plaintiff.

The defendant having given in evidence the alleged petition by De Haro, in 1844, in which the disputed word playa or plaza occurred, then offered in evidence a copy of said petition, certified by Guillermo Hinckley.

This was accompanied with evidence tending to show the genuineness of Hinckley's handwriting, and was offered "for the purpose of showing that the same was in existence during the life-time of the said Hinckley."

This was admitted and excepted to. This was error. This does not purport to be an official certificate, nor does it appear, nor is there any presumption that Hinckley was then in office, the election of Alcalde being annual. So that if he were in office March 1st, 1844, it is to be presumed that his term had expired before April 1st, 1845. But even if he had been in office, he had no power to give such a certificate. It was extra official. (*Williams* v. *Merle,* 11 Wend. 80, 82; *Ayers* v. *Stewart,* 1 Overton, 221; *Robinson* v. *Clifford,* 2 Wash. C. C. R. 1; *Wolf* v. *Washburn,* 6 Cow. R. 261, 265, 266; *Oakes* v. *Hill,* 14 Pick. 442, 448; *Bank of U. S.* v. *White,* 1 Wright, 51, 52; *Hathaway* v. *Goodrich,* 5 Vermont, 66, 67; *Davis* v. *Clements,* 2 N. H. 390.)

The receiving of this paper in evidence was therefore error. It was in fact saying to the jury: "You may believe that the word was originally written plaza, because

Hinckley, who died in 1848, made a copy during his lifetime, in which it appeared as plaza."

The Court erred in receiving the books of John C. Davis & Co., in order to show that a blacksmith shop was built on the lot in question for Finch, who was in possession. (1 Greenleaf on Ev. secs. 116 and 123; *Higham* v. *Ridgway*, 10 East. 109.)

The admissibility of books of account cannot be justified beyond the rule laid down in *Price* v. *The Earl of Torrington;* 1 Smith Lead. Cases, 390 (*139).

These cases our analysis resolves into two classes: First. Those which are made in discharge of an official, or *quasi* official duty. Secondly. Those which are made in the course of a party's own business, or by the agent of one or both parties.

The gradual enlargement of the rule may be seen by comparing the case of *Gleadow* v. *Atkin*, 1 Crompt. & Meeson, 410, with the cases preceding it in point of time. The cases in this country have not got beyond *Augusta* v. *Windsor*, 1 Appleton, 19 Maine, 317. In this case it is left in doubt whether the decision is put upon the ground first stated, that the breaking of the limb and the services of the physician having been proved, it would be reasonable to expect that the time of performing them would appear from his books (Id. 321); or upon the principle cited from *Nicholls* v. *Webb*, 8 Wheat. 337, that memoranda made by a person in the ordinary course of his business of acts or matters, which his duty in such business requires him to do for others, in case of his death are admissible evidence of the acts or matters so done. (Id. 321.) Either this *quasi* official duty of a surgeon to go when called, or the other point that the service performed was proved *aliunde*, affords a solution of the case of *Higham* v. *Ridgway*, 10 East. 109, *ut supra*, which has given so much trouble to courts and commentators. The case of 8 Wheat. 337, cited by the Court in *Augusta* v. *Windsor*, puts the decision upon this point of official or *quasi* official duty. But neither of them touch the present case. *Dow* v. *Mitchell*, 29 Maine, 117, does not go beyond the principle of ordinary agency.

The Court erred in admitting other entries from the account books of John C. Davis & Co., to be read in evidence.

Nye, a witness for plaintiff, had testified that Daniel Sill, senior, had, as a blacksmith, done some work for him in his shop on the lot in question, in 1843, namely; some bolts and spikes. That the ship Fama was one of witness's ships, which he sailed into the port of San Francisco. Also that he was not in San Francisco in March, 1844, or January, 1845.

To contradict this testimony of Nye, the defendants were permitted to read to the jury, under objection and exception of the plaintiff, certain entries from these same books of John C. Davis & Co. against "Capt. Nye, Fama," extending from October 3d to December 9th, 1844.

Such entries being admitted on the ground of agency (not of official or semi-official duty), were never received against third persons. (Cow. & Hill's Notes to Phil. Ev., Part I, Vol. III, 3d Ed. p. 314, under note 201.) The book charges offered must be "book charges in account with the identical party against whom they are offered in evidence." (*Rogers* v. *Old*, 5 Serg. & R. 404.) "A book kept by a forgemaster for the purpose of settling with his workmen, in which are entered their names, the quantity of iron delivered, the date, and sometimes the price, is not such a book of original entries as is evidence against a purchaser of the iron, though it contains also the names of purchasers."

*Juniata Bank* v. *Brown*, 5 Serg. & R. 226: "In a suit between A and B, the original entries of C are not evidence to show a collateral fact, as that A was charged by C as a partner in a certain house."

The Court erred in admitting entries from Nathan Spear's books to be read in evidence.

The plaintiff had introduced testimony tending to show that Sill, senior, John Finch, and one Francis Westgate were seen working together in a blacksmith's shop on the lot in question, in 1843 and 1844.

To rebut this, the defendants produced on the witness-stand, W. H. Davis, who testified that he was clerk of Na-

than Spear, deceased, formerly a merchant in Yerba Buena; that he, Davis, kept Spear's book of accounts, which he produced, and had made the entries therein contained, which were correct; that Westgate, Finch, Sill, and John C. Davis had worked together on Davis' lot 18, below the lot in question; that Westgate had left San Francisco in 1841, and never returned; that is, had never returned to witness' knowledge, which, of course, was all he could know about that.

Defendant then read in evidence certain entries from Spear's books, in order to show that Westgate, Finch, and Sill had been in partnership in the blacksmith business sometime anterior to 1841.

This was error. (Cowan & Hill's Notes to Philips' Ev., vol. 1, note 275; vol. 2, note 377.)

The testimony of Hopkins, the keeper of the archives, who, after a comparison of the handwriting of Francisco De Haro in the archives with that to the document of March 3, 1844 (his signatures to petition and transfer), purporting to have been made by him, was asked whether he considered the grant to be genuine, should certainly have been excluded. The authorities are many upon this point. A few may be cited: 1 Greenleaf's Ev., Secs. 576-7-8; Starkie's Ev., Part IV, marg. p. 657; *Strother* v. *Lucas*, 6 Peters, 763; *Fuentes* v. *U. S.*, 22 How. 456.

In *Woodman* v. *Dana*, 52 Maine, p. 15, the Court says: "As we have clearly seen, no witness, except an expert, is competent to give an opinion simply by comparison of hands by juxtaposition, and this is done by the production of the standard in open Court."

How much less, then, we urge, can an expert, after a comparison outside of the Court, and perhaps under the instruction and pay of the adversary, be permitted to give his opinion as to signatures the genuineness of which are controverted, forming his opinions on signatures not admitted or proved in this case. (8 Vesey, 438, 474; *Moody* v. *Rowell*, 17 Pick. 490.)

Disputed writings cannot be used for comparison of handwriting. (Cowen & Hill's Notes to Phil. Ev., Part

II, p. 256, note 478.) This is the result of the authorities. Among undisputed writings, ancient writings may be used for comparison of handwriting; but writings are not ancient when there are living witnesses who have seen the party write. (*Rowt's Administrator* v. *Kile's Administrator*, 1 Leigh, 222; *Jackson* v. *Brooks*, 8 Wend. 426; S. C., 15 Wend. 111.)

The Court erred in receiving "Book A of Original Grants" in evidence. The plaintiff's source of title, the grant from Sanchez to De Haro, appearing in Blotter B of Original Concessions, where it ought to appear, and the alleged grant from Hinckley to De Haro not appearing at all in Blotter B, the defendants produced "Book A of Original Grants," in which Alcalde Bartlett entered copies of such alleged grants as were brought to him for that purpose, in order to show that there were original Alcalde grants, which did not appear in Blotter B.

This was error. These books would doubtless have been *prima facie* evidence in an action brought upon one of these alleged grants, upon a direct issue as to its genuineness, the loss of the original being first shown. (*Touchard* v. *Keyes*, 21 Cal. 202; *Davis* v. *Davis*, 26 Cal. 45.) But when the issue is upon the genuineness of another alleged grant, the genuineness of these alleged grants are altogether too collateral and remote from the main issue to be brought into the controversy. Still more if the controversy is about originals, the originals should be produced.

The Court erred in admitting in evidence the memorandum kept by Alcalde Bartlett. This does not come within the case of *Kyburg* v. *Perkins*, 6 Cal. 675.

As to plaintiff's negligence in sleeping on his rights, there was evidence tending to show that Sill, Senior, lost his title papers at least as early as 1847; plaintiff offered to show that when Sill, Senior, returned in 1850 to California (from his trip home in 1849), he made application to an officer in the U. S. army (Capt. Folsom) for advice and aid in getting possession of the lot in controversy as his lot; and which efforts of Sill to procure his lot, we propose to follow up from that date.

This was offered to rebut the apparent neglect and long acquiescence of Sill, Senior, in that he allowed defendants to remain in possession, as they proved by their witnesses in defense, for so many years, to wit: From 1847 down to the commencement of this action.

Now it nowhere appeared (but on the contrary) that Sill had ever been able to find these lost papers, without which, or a record or copy of them (neither of which had appeared until after his death), the maintaining of an action would have been impossible, and to have commenced it, an idle ceremony, resulting in nonsuit and costs.

The testimony as to plaintiff's ancestor's negligence in sleeping on his rights was either relevant or it was irrelevant. If relevant, then the plaintiff had a right to reply to it, by showing why, and under what advice or influences plaintiff's ancestor had delayed the assertion of his rights.

The Court erred in refusing plaintiff's ninth instruction. It was very material for the jury to decide whether the word was originally written playa or plaza; for if they found it was originally written playa (beach), they might also find that that portion of the beach was far remote from the north-west corner of Washington and Kearny streets.

It is too well settled for further discussion, that it is the province of a jury to find whether or not a written instrument has been altered or not, as it is for the Court to determine the effect of the alteration. And this effect is, that the paper will be read as it originally stood, if that can be ascertained by the jury. (*Armstrong* v. *Burrows*, 6 Watt. 266; *United States* v. *Linn*, 1 How. U. S. R. 104, 110; *Steele* v. *Spencer*, 1 Peters, U. S. R. 560; *Wood* v. *Steele*, 6 Wallace, U. S. R. 82; *Galland* v. *Jackman*, 26 Cal. 85; *Herrick* v. *Walin*, 22 Wend. 388; *Davidson* v. *Cooper*, 11 Mees. & Wels. 778; *Masten* v. *Miller*, 4 T. R. 320; *Harriman* v. *Dickinson*, 5 Bing. 183.)

*S. M. Wilson* and *J. B. Felton,* for Respondent.

If an original paper is not only admissible, but actually admitted, the giving in evidence of an exact copy could do

no harm. Even if it were an error, it would not be such an error as would cause a reversal. (*Merle* v. *Matthews*, 26 Cal. 467 and cases cited; *Hebron* v. *Jefferson*, S. & M. Co. 33 id. 290; *Bradley* v. *Lee*, 38 id. 362.) .

The copies made by Hinckley were referred to in the duplicate original deed of Finch to Thompson, and were therefore admissible as part of that deed. (*Caldwell* v. *Center*, 30 Cal. 542; *Hicks* v. *Coleman*, 25 id. 122; *Satterlee* v. *Bliss*, 36 id. 489.)

But an attempt was made by appellant to show that the word "plaza," in the grant to Hinckley, was originally written "playa." The defendants had a right to show the antiquity of the papers attacked, and that no recent alteration could have been made, but that the paper existed in its present form twenty years before suit brought. (*Rice* v. *Cunningham*, 29 Cal. 500.)

John C. Davis & Co. kept at the time of the erection of the building for Finch, a set of books, and the labor and materials were regularly charged upon these books to Finch as furnished him. John C. Davis was the bookkeeper; all the entries were in his handwriting. He died in 1848. Thus it was demonstrated that these books could not be fabricated for this trial, but had been kept by a man who, when this suit was commenced, had been sixteen years in his grave. It would be curious if, in the reason and philosophy of the rules of evidence, any objection to such ancient and written memorials of current events, made in the due course of business and without a motive to deceive, could be found. In the ordinary affairs of life it would be conclusive with us. Upon the most important matters of our welfare we would accept it without doubt. We are happy to be able to say, that the practical and sensible rules of evidence according to the common law, make it also competent in courts of justice.

The objections by plaintiff's counsel are substantially: 1st, That the entries were not in the handwriting of any living witness in attendance on the trial; 2d, That they were inadmissible [for what reason, not stated]; 3d, That the entries are not against the interest of the party making them.

As we understand the rule, the fact that the witness who made the entries is long since dead is one of the reasons that make such entries admissible, though in many cases that is not now considered indispensable; and that the entries must be against the interest of the party making them is long since exploded. The general objection of inadmissibility is not a sufficient objection. The exact point of the objection should be stated. (*Owen* v. *Frink et al.*, 24 Cal. R. 177; *Dreux* v. *Domec*, 18 id. 83; *Kiler* v. *Kimball*, 19 id. 267.)

But no good objection could have been stated. The very cases cited by the learned counsel for appellant are in our favor.

The gist of the whole thing is stated by Mr. Justice Taunton, in *Doe* v. *Turford*, 3 B. and Ad. 898, thus: "A minute in writing, made at the time the fact it records took place, by a person since deceased, in the ordinary course of his business, corroborated by other circumstances which render it probable that the fact occurred, is admissible in evidence." There the services of a notice to quit, by a landlord, was proved by such a minute.

The case of *Doe* v. *Turford* was expressly recognized and approved in *Poole* v. *Dicas*, 1 Bing. N. C. 649.

Hare & Wallace, in their notes to *Price* v. *The Earl of Torrington*, *supra*, say that that case has often been confirmed in this country, " and it may be taken as the settled rule of all the States, that entries made in the usual course of business by the plaintiff's clerk are admissible in evidence after his death on proof of his handwriting;" citing *Lewis* v. *Norton*, 1 Wash. 76; *Clark* v. *Magruder et al.*, 2 Har. & John. 77; *Clemens* v. *Patton et al.*, 9 Porter, 289; *Everly* v. *Bradford*, 4 Ala. 371.

For other instances of such entries being admissible in suits between third parties, see *Batre* v. *Simpson*, 4 Ala. 306–312; *Brown* v. *Steele et al.* Ex. 14 Ala. 63; *Nourse et al.* v. *McCoy et al.* 2 Rawle, 70; *Brewster* v. *Doane et al.*, 2 Hill, N. Y. R. 537, and others there cited; *Smith* v. *Lane*, 12 Ser. & Raw. R. 84; *Heart* v. *Hummel*, 3 Barr. 514; *Merrill* v. *Ithaca & O. R. R.*, 16 Wend. 587; *State* v. *Rawle*, 2 Nott & McC. 334; *Clark* v. *Vorce*, 15 Wend. 193.

The principle we rely upon, is constantly acted upon to prove the birth of children, the physician who attended having in the due course of his business made the entry in his book. (*Higham* v. *Ridgeway*, 10 East. 109.) So as to baptism and marriage; the entries by the clergyman in his parish register being competent, though no law requires it to be kept; the proposition acted upon in an enlightened and practical system of jurisprudence being, that entries made by a person in the due course of business, at the time the occurrences happened, are probably true, there being nothing to attach suspicion to the transaction.

The defendant's testimony showed that there was no blacksmith shop or other improvement on lot 31 till John C. Davis & Co. built it for Finch in the fall of 1844.

In connection with the foregoing facts, and to correct Capt. Nye's recollection, or, more accurately speaking, to show how mistaken he was, the books of John C. Davis & Co. were introduced to prove that the very work Nye referred to was done at the shop of John C. Davis, in October, November, and December, 1844.

These books showed that Capt. Nye, with his ship "Fama," was in this port, and that, on the 3d of October, 1844, the 22d of November, 1844, December 2d, 1844, and December 9th, 1844, the blacksmiths and shipwrights, on the adjoining lot No. 18, had done a series of work, and furnished, among other things, the bolts and spikes referred to, for the ship.

Capt. Nye had sworn he was not here from March 2d, 1844, to January 1st, 1845, but "was down the coast." This evidence was like the check-rolls in *Merrill* v. *The Ithaca and Owego R. R. Co.*, 16 Wend. 597–8, and like the entries of the surgeons in the cases above referred to.

The authorities cited by the learned counsel in their brief, in this connection, were cases where persons were offering in evidence books as books of account between the parties, on the general rule as to merchants' books. They do not impugn the cases we have above so fully commented upon. Cowen & Hill, in their Notes, entirely sustain our views, and put the case upon the doctrine of Lord Torring-

ton's case, and the "obvious principle, not only as letting in all books of account kept by a deceased clerk, but all other entries or memoranda made in the course of business or duty, by any one who would at the time have been a competent witness to the facts which he registers." (See 3 Phil. on Ev., Part I, Cowen & Hill's Notes, p. 292, *et seq.* (3d ed.), note 200 to p. 317, and the large number of cases there collected.)

As part of the testimony introduced by the plaintiff, tending to show the possession of said lot 31, was certain parol testimony, to the effect that Finch and one Westgate, were seen working together in a blacksmith's shop, which the witnesses, testifying in that regard, thought was on lot 31 in the years 1843 and 1844.

If the defendants could prove that these three persons had once been in partnership in blacksmithing, but that it was several years prior to 1843, and that Westgate had left the country prior to 1843, it would seem that such evidence would show very satisfactorily that the plaintiff's evidence above cited was incorrect, as to time and locality. It will be remembered that there is no pretence to any grant of this lot before 1843, and that there is, consequently, no pretence of any possession before that year.

On turning to the account book of Nathan Spear, a very respectable merchant in Yerba Buena, we find under date of October 25th, 1839, that Sill, Finch and Westgate at that date were jointly engaged in blacksmithing.

John Finch is credited by one third "blacksmith concern;" Daniel Sill is credited by a like one third, and Francis Westgate is credited with his share, and John Davis & Co. are charged in the same connection. Here then, as early as October 25th, 1839, is the most satisfactory evidence that these three persons, having joint interests in a "blacksmith concern," had transferred their several interests to Nathan Spear at that date.

There is nothing in the proposition of appellant's counsel, that as the witness, Wm. H. Davis, was on the stand, and he made the entries, the entries themselves are inadmissible. The entries themselves are not only corroborative, but

original, independent evidence. (1 Green Ev. Sec. 116; *Digby* v. *Stedman*, 1 Esp. 328.)

The fact of the three parties, Finch, Westgate, and Sill, being engaged in blacksmithing together, was proven on both sides. The great question was when it was. The books established that, and with that the place where was clear.

When the defendants came to put in their evidence, they called Mr. Hopkins, the keeper of the Mexican Archives in the Surveyor-General's office, the very papers through which Mr. Liés became qualified to testify. If Mr Liés was so qualified, Mr. Hopkins was tenfold better qualified. His testimony shows an extraordinary opportunity of becoming familiar with De Haro's handwriting. Here were the signatures of De Haro in an official capacity to "several hundred official documents," kept under circumstances demonstrating their genuineness. For fifteen years Mr. Hopkins had been among them.

He also had examined, and was familiar with Blotter B, about which Liés had testified, and in which De Haro's handwriting existed. This Blotter B was already in evidence, with the proof by plaintiff that all the entries for the year 1843 were in the handwriting of De Haro. On both these sources of information Mr. Hopkins testified, and gave his opinion as to De Haro's signature.

This is clearly not a comparison of handwriting, but is an opinion given by Mr. Hopkins from an exemplar in his own mind existing for many years. The objection to a comparison is mainly that the specimens may be unfairly selected, and calculated to serve the purpose of the parties producing them; and, therefore, not exhibiting a fair example of the general character of the handwriting. (See *Burr* v. *Harper*, 1 Holt, N. P. Cases, 420.) Here no such danger could exist. The correspondence consisted of several hundred documents of an official nature, preserved by two Governments as genuine. The test of genuineness was perfect. The opinion of Mr. Hopkins was derived from the general character of the mass of writings, running over a space of fifteen years. How much better is this than to have seen a

party write once, or to have written him a letter and got back a letter in reply? Yet these facts qualify a witness to give an opinion.

Could not the Commissioner of the General Land Office at Washington acquire a sufficient knowledge of the handwriting of his predecessors, by years of examination in his office, officially? Could not the Hon. Joseph S. Wilson testify as to the handwriting of his predecessor, Hon. Thos. A. Hendricks, whose official signature he has a thousand times had to see and pass on in the Commissioner's office?

This view is fully sustained by two cases in South Carolina, which are more nearly parallel to the case at bar than any other cases found. (See *Turnipseed* v. *Hawkins*, 1 McCord, 279; *Duncan* v. *Bean*, 2 Nott & McC., 406.) " All evidence of handwriting, except where the witness saw the document written, is in its nature comparison. It is the belief which the witness entertains, upon comparing the writing in question with its exemplar in his mind, derived from some previous knowledge." (1 Greenl. Ev. p. 711, Sec. 576.)

In England, a deed thirty years old goes in evidence without proof of execution. In this case the paper transfer was over twenty-four years old. And here, that should admit it in evidence, being a greater time, considered in reference to our Statute of Limitations, and other laws in regard to time, than thirty years in England. (See *Green* v. *Covillaud*, 10 Cal. 330–1; *Grattan* v. *Wiggins*, 23 id. 34.)

But independently of this, Mr. Hopkins had seen and examined Blotter B, which was already in evidence and admitted to be genuine by plaintiff. Here is the very case mentioned in the authorities where an expert may testify. (1 Greenl. Ev. p. 713, sec. 578; *McAllister* v. *McAllister*, 7 B. Mon. 269, 270; *Hicks* v. *Person*, 19 Ohio, 426; *Baker* v. *Haines*, 6 Whar. 284, 291; *Dupue* v. *Place*, 7 Barr. 428; *Bird* v. *Miller*, 1 McMullan, 120, 125; *Admrs. of Rogers* v. *Shaler*, Anthony N. P. 149; *Moody* v. *Rowell* 17 Pick. 490; *Richardson* v. *Newcomb*, 21 id. 315; *Com.* v. *Eastman et al.*, 1 Cush. 190, 217; *Hammond's Case*, 2 Greenl. R. 33; *Lyon* v. *Lyman*, 21 Vermont, 256; *Waddington* v. *Cousins*, 7 C. & P. 595.

It was-contended upon the trial that Blotter B was a sort of *Toma de Razon*, or register, and that no grant could be considered genuine unless noted therein.  The object of introducing Book A was to show this theory untrue in fact.  The plaintiff put in a large part or all of Blotter B. Defendants put in a good deal of Book A of original grants.  The book itself has been frequently held official and received in evidence.  (*Rice's Administrator* v. *Cunningham*, 29 Cal. 493; *Donner* v. *Palmer et al.* 31 id. 500.

This book was proved to be an official book, as well for the entry of grants newly made, as for registering and recording grants previously made.  It is now an official record in the office of the County Recorder.  Copies from this are now of the same effect as copies from the books of record since the Recording Act.  (See *Garwood* v. *Hastings*, 38 Cal. R. 216–219; *Touchard* v. *Keyes*, 21 Cal. 203.)

Even the Syndico's book of accounts has been held competent, as affording evidence tending towards a determination of the question of the delivery of grants.  (See *Kyberg* v. *Perkins*, 6 Cal. R. 674; approved in *Donner* v. *Palmer*, 31 id. 519.  See also authorities there cited.)'

*Wm. W. Chipman* and *George F. Sharp*, for Appellant in reply.

By the Court, MCKINSTRY, J.:

At the trial the plaintiff claimed to have proved a grant of the lot in controversy, made in 1843 by Sanchez, Justice of the Peace, to De Haro; and a subsequent transfer in the same year of the rights of De Haro to Daniel Sill, Sr., plaintiff's ancestor.

The defendants introduced evidence tending to show a sale of the premises by Sill, Sr., to George Davis; the making of a new grant in 1844 by Hinckley, Alcalde, to De Haro, and a conveyance by De Haro to Davis—all with the consent of Sill, Sr., who received the purchase price of the lot from Davis.  Defendants gave in evidence the original petition of De Haro, on which the concession last mentioned

was made, the original of the grant by Hinckley, and the
original instrument executed by De Haro—and indorsed on
the grant—which transferred to George Davis the title, if
any, thus acquired.

These writings were upon one sheet of paper and on the
back thereof was written a duplicate original of the bill of
sale about to be mentioned.    To the introduction of these
original documents no objection was made by the plaintiff.

The defendants having introduced evidence tending to
prove that one John Finch had derived title from George
Davis, offered an instrument, executed by Finch, which is
spoken of in the record as a bill of sale.  This instrument
was indorsed on a copy of the De Haro petition, the Hinck-
ley grant, and the transfer from De Haro to Davis.    The
offer was accompanied by testimony tending to show that
the copy, and the bill of sale, with the exception of Finch's
signature, were in the handwriting of Hinckley.    To the
introduction of the copy, and of the duplicate bill of sale
indorsed, the plaintiff objected.    The action of the Court
below, in overruling this objection, is assigned as error.
The bill of sale contains no description of the premises,
except that in the copy of the petition.    It recites: "I, the
undersigned, being the legal owner of the lot mentioned in
this concession," etc., and proceeds to declare, "I have
sold to John Thompson one half," etc.    The preceding
copy of the papers referred to, the original of which con-
stituted the evidence of a "title by concession" to a par-
ticular lot, was therefore necessary to identify the land sold
by Finch to Thompson; it became a part of the instrument
executed by the former, and rendered that instrument
effectual.

The defendants claimed under Thompson, and were enti-
tled to show that the bill of sale was delivered to him when
it was executed.    This was proven *prima facie,* when the
defendants produced it at the trial; but the like consequence
did not follow from the production of the original papers.
At the time of these transactions no registry law was in
operation, and it was necessary and proper for each indi-
vidual proprietor to keep within his own control, all his

muniments of title. We must presume, in the absence of evidence to the contrary, that the parties adopted the natural and reasonable course accordant with the existing law; that Finch retained the originals as evidence of his own right, and delivered the copies (forming a portion of the bill of sale) to Thompson, to whom he sold one half the property; and that Thompson, who afterwards claimed the whole lot as survivor of Finch under an agreement contemporaneous with the bill of sale, became possessed of the original petition and grant after the death of Finch. The bill of sale, including the copy, therefore, was not immaterial or incompetent as evidence.

The bill of sale is dated April 26th, 1845; Hinckley died in 1846. The defendants proved that the copy of the grant and bill of sale attached were in the handwriting of Hinckley; and, when they were offered in evidence, declared that they were offered as evidence tending to establish the existence of the originals during the life-time of Hinckley. We are not prepared to say that counsel is bound by the declaration of a limited purpose, so as to be estopped, after the introduction of evidence, from drawing from it other deductions than that suggested by the terms of the offer. Certainly he should not be, unless injustice has been done to the opposite party by permitting such new inferences; and this cannot be made out by mere assumption or conjecture, unsupported by any fact appearing in the record. Indeed, counsel has no power to limit the effect of evidence; it would hardly be contended that the opposite party cannot use it in any legitimate manner before the jury. The statement of a "purpose" is only a reason, addressed to the Court, why the particular evidence should be admitted; the effect of the evidence is to be limited, in proper cases, in the charge to the jury. Besides, the making of the copies and the introduction of them into the bill of sale by Hinckley, when he was called on to prepare that instrument, was in the nature of a contemporaneous act; and the admission of the proof of that act may be vindicated by similar reasoning to that hereinafter employed with respect to the account-book tendered in evidence.

The next error assigned is the refusal of the District Court to strike out the answer of the witness Rose, to the question found at folio 212 of the transcript. The answer was responsive to the question, and counsel did not specify the points on which they rested the motion. In such cases the moving party should specify his objection to the answer, with the like particularity as is required in pointing out an objection to a question. The same reasons render this proper.

Evidence having been given on the part of the plaintiff, that Finch, while in possession of the disputed premises, declared that he was possessed only as the agent of Sill, senior; the defendants, by way of rebuttal, endeavored to prove that Finch erected upon the premises a building of great value as compared with the then value of the lot. To do this, defendants offered in evidence, among other things, the books of John C. Davis & Co., containing an account against Finch, which was in the handwriting of John C. Davis, who died in 1848. This was accompanied by testimony tending to show that the articles charged went into the building on the lot occupied by Finch, and that it was agreed between Finch, John C. Davis & Co., and Davis, that the articles should be supplied to Finch by John C. Davis & Co., and should be paid for by transfer to the firm of an existing demand in favor of Finch against Davis. The plaintiff objected to the entries in the books on the ground that the evidence offered was hearsay and incompetent. The Court overruled the objection, and this is assigned as error.

The gist of the argument against the admissibility of the entries in the books seems to be that they were not against, but for the interest of the party who made them. This does not render them necessarily incompetent. The account was a corroborative circumstance; one of a series of facts tending to prove that the building was erected by Finch at his own expense. From the transcript it appears that other evidence was given to the point that Davis & Co. did, in the year 1844, provide the materials and build and furnish for Finch a blacksmith shop, etc., on the lot in

controversy. There are two kinds of admissible entries made by third parties; one consisting of entries against the party's interest, deriving their admissibility from this circumstance alone. The value of the second class is that it was contemporaneous with the principal fact, forming a link in the chain of events, and being part of the *res gestœ*. It is not merely the declaration of the party, but it is a verbal contemporaneous act, belonging, not necessarily, indeed, but ordinarily and naturally, to the principal thing. (1 Green. Ev. Sec. 120.) This distinction was taken and clearly expounded by Mr. Justice Parke, in *Doe d. Patter-shall* v. *Turford*, 3 B. & Ad. 890. That learned Judge said: " Counsel for defendant has contended that such an entry is to be received in two classes of cases only—first, when it is against the interest of a deceased party who made it; and secondly, when it is one of a chain or combination of facts, and the proof of one raises the presumption that another has taken place. I agree in the rule as laid down, but I think that in the second case a necessary and invariable connection of facts is not required. It is enough if one fact is ordinarily and usually connected with another." The views of Mr. Justice Parke, in *Doe* v. *Turford*, have been cited and approved in many English and American cases; and, upon principle, the distinction there taken should be maintained. In the present case, evidence having been already introduced tending to establish the fact that the house was built and the materials furnished by John C. Davis & Co., the contemporaneous charges in their books constitute evidence of some force. It was certainly the " ordinary and natural," or usual course, for that firm to charge the materials to the person to whom they are alleged to have been furnished. There was no error in admitting the account; and we think the principle just considered also justified the admission of the charges against Gorham H. Nye, as well as those contained in the books of Nathan Spear.

At the trial below, one R. C. Hopkins was called as a witness on behalf of the defendants, who (having testified that, for fifteen years, he had been the custodian of the

Mexican archives in California, in the office of the Surveyor-General; and further testified as to his familiarity with the documents composing such archives, and particularly with the signature of Francisco De Haro, from having consulted several hundred official documents therein, with the signature of said De Haro thereto as a Mexico-California official, etc.) was asked: " Whether, in his judgment and opinion, he considered the said signature of De Haro to said petition and grant to be genuine ? "

The question presented by the foregoing is not what writings may properly be employed by an expert, on the witness stand, as the basis of his opinion that a particular writing is or is not genuine. In all such cases, the opinion of the witness is based upon a comparison—within the narrower meaning of the word—of the contested signature with others proven or admitted to be genuine, and introduced in evidence. But if a witness have a proper knowledge of the handwriting of the person whose writing is in dispute, he may declare his belief in regard to the genuineness of the particular signature in question. In a broad sense, all evidence of handwriting, except where the witness saw the document written, is comparison. But a distinction is recognized between an opinion based upon the juxtaposition, in the presence of the jury, of the disputed and other signatures, and a belief engendered of the witnesses' previous knowledge of the party's handwriting; the conscious comparison of the writing in dispute with an exemplar in his own mind—the product of such previous knowledge. In the former case, the expert is required promptly to exercise his skill, derived from experience and study; in the latter, the ordinary witness recalls the prototype, and without being able perhaps to analyze critically the grounds of his own faith, feels that he knows the handwriting.

There are two modes of acquiring this knowledge, each of which is universally admitted to be sufficient to enable a witness to testify on the subject. The first is from having seen the party write. The second mode is from having seen letters, bills, or other documents purporting to be in the

handwriting of the party; evidence of the genuineness of such writings and of the identity of the party being, of course, added *aliunde.* (1 Greenl. Ev., Sec. 577.)

"In both these cases," adds Mr. Greenleaf, "the witness acquires his knowledge by his own observation of facts, occurring under his own eye, and, which is especially to be remarked, without having regard to any particular person, case or document."

If it can be assumed that the Mexican archives in the Surveyor-General's office are genuine, the man who has read these archives and familiarized himself with the official signatures, several hundred in number, of the person whose signature is the subject of inquiry, has certainly as much knowledge of that person's handwriting as one who has received "letters or bills" purporting to be in the handwriting of a party whom he has never seen. (See in this connection, *Turnipseed* v. *Hawkins,* 1 McCord, 279.) The archives referred to are public documents and records guarded by the former Government in California, as evidence of the facts to which they relate, and which the Secretary of State was directed to preserve in his department. (Acts of 1851, p. 443.) They were afterwards transferred to the care of the Surveyor-General of the United States. (Concurrent resolution, Laws of 1858, p. 270.) These documents and records have remained continuously in official custody, and although it is not impossible that in some instances forged papers have been surreptiously or corruptly placed among them, the presumption that officers have done their duty in preventing such frauds, applies equally to the public functionaries of Mexico, and to those of our own Government. It was necessary to prove the validity of such documents in the archives where the object was to show title derived by grant from the former Government before such grants were confirmed; but there can be little danger in assuming the genuineness of the signatures from which the witness acquired his knowledge for a collateral purpose like that under consideration. It may happen that these archives are the only source of information.

In the progress of the trial, the plaintiff introduced evi-

dence tending to prove that Daniel Sill, senior, during the whole of the year 1846, carried on the business of keeping a bowling alley on the lot in controversy; that he alone occupied the lot, and that Finch was his hired hand or servant. The defendants put in evidence tending to show that Finch & Thompson built the bowling alley as their own, and for their own use. Further, after proving that the signatures were genuine, the defendants offered writings in Spanish, on one sheet, which were:

1.   A petition to the Justice of the Peace by Finch & Thompson, dated June, 1846, which alleged, "we have commenced and are about to finish a bowling alley," etc., and prayed for a license to conduct the said business.

2.   An act or order of the Justice to the effect that "in consideration of the circumstances recommending the petitioners" he had caused to appear before him three villagers (naming them,) whom he had examined, as immediate neighbors, if they approved of the construction which was being made "in the house of Señores Juan Finch and John Thompson," or if the same would incommode them, to which they responded they would not be molested thereby, and "for their security they signed the same with the present Judge; the interested parties being subject to police regulations." And to this end, "thatthe beneficiaries may have the proper security, this document is returned to them," etc.

We do not think the objections to this paper were well taken. The act of the Justice, Noe, was the record of an open investigation, judicial in its character. It was not conclusive as a judgment against plaintiff's ancestor; but it was submitted to the jury whether such a transaction, in the hamlet of Yerba Buena, and in respect to the very property and business which it is alleged Sill, Sr. then occupied exclusively, and was conducting, was not known to him; and, if so, whether his silence, or failure to oppose the license to the others, did not tend to disprove the assertion that Finch was merely his servant.

In the same year Alcalde Bartlett issued his proclamation (which has become historical,) in pursuance of which Finch

and Thompson presented their title papers, and a minute of
the same was made by the Alcalde in his "Index Book."
This book, and the circumstances under which the entries
were made in it, also tended to show notice to Sill, senior,
of an open and notorious adverse claim to the lot, on which,
by plaintiff's theory, Finch was laboring as a "hired hand."

The defendant introduced evidence tending to prove that
from 1850 Sill, senior, never asserted his title to the per-
sons in possession of the lot under Thompson.    In rebuttal,
plaintiff offered to prove that, on one occasion, the said Sill
advised with an army officer in respect to the mode of re-
covering the property; the conversation never having been
communicated to the parties in possession.    The proffered
evidence was properly rejected.

As we have seen, when the petition of De Haro, of March,
1844, was offered, it was not objected to.    When, however,
the counsel for plaintiff came to sum up the case, "he in-
sisted and urged to the jury that the word 'plaza' in said
petition, was originally playa (beach,) and afterwards
altered to plaza, and that such alteration was perceptible to
their own ocular inspection."    The Court permitted the
jury "to inspect and examine said petition, and to judge for
themselves."    This was equivalent to the ninth instruction
subsequently asked by the plaintiff; and there was no sub-
stantial error in refusing the instruction.

The plaintiff requested the Court to charge the jury: "If
the jury find that any material word in said descriptive por-
tion of said petition has been altered since it was first writ-
ten, and that no memorandum or note of such alteration was
made at the foot of either the petition or concession, before
the signature of the petitioner, or magistrate, or of the sub-
scribing witnesses, was written, then they will find such
alteration to be null and void, and that the word so altered
must read at this time as if no alteration had been made,
and as the same was originally written."

If we assume (what hardly appears in the transcript) that
the petition was altered apparently after it was signed and
the grant made, and that the burden was cast upon the de-
fendants of showing "that the alteration was made with the

consent of the parties affected by it, or otherwise properly or innocently made," the question still remains: Were there any facts or circumstances in evidence tending to show that the alteration was made with such consent, or innocently? If there were, the instruction was properly refused, since, by its terms, it excludes all consideration of such evidence.

The transcript reads:

"The defendants then introduced testimony tending to show that, on or before March 1st, 1844, the said Daniel Sill, ancestor of the plaintiff, as aforesaid, sold all his interest in the said lot 31 to one George Davis, for the sum of fifty dollars, then and there paid by the said George Davis to the said Daniel Sill, and by the said Daniel Sill accepted in that behalf; and that said Sill declared to said George Davis, at the same time, that the title to said lot was not vested in him, and that he had no paper title to the same, but that the title remained in said Francisco De Haro, and that he would cause said De Haro to make out the proper transfer of the title to said lot to said George Davis; and that therefore the said George Davis and Daniel Sill, together with one Guillermo (William) S. Hinckley, who was then and there First Alcalde of the pueblo of San Francisco, or Yerba Buena, went to the Mission of Dolores, where the said Francisco De Haro resided, for the purpose of having a transfer of said lot executed, in pursuance of said sale by him to said George Davis; and that thereupon, by the advice of said Hinckley, Alcalde as aforesaid, and with the assent of the said Daniel Sill, ancestor as aforesaid, and with a view to extend the time for complying with the conditions of said grant of said lot, made in the year 1843, by said Francisco Sanchez, Justice of the Peace, as aforesaid, the said Francisco De Haro petitioned anew for a concession of said lot; and that the same was thereafter conceded to him by said Hinckley, on March 3d, 1844, being, at the time of said last-mentioned concession, Alcalde as aforesaid, and afterwards granted by said Francisco De Haro to the said George Davis; said last-mentioned petition, concession, and grant, being in writing and in the Spanish language," etc.

This evidence certainly tended to show that it was the intention of all parties that the lot in controversy (No. 31) should be granted anew to De Haro, and that if the alteration was made after the petition and grant were executed, it was made to conform the papers to the intention of all concerned.

The exception to the oral charge of the Court, on the return of the jury for further instructions, was general. The party excepting should specifically point his objection. (*Hicks* v. *Coleman*, 25 Cal. p. 122; *St. John* v. *Kidd*, 26 Cal. p. 263.) The Court should have an opportunity to modify or correct any form of expression inadvertently used in its oral charge.

Another exception is based on the action of the District Court in overruling the plaintiff's objection to the "Book A of Original Grants." The book was admissible as primary evidence. (*Donner* v. *Palmer*, 31 Cal. p. 500.) It therefore tended to prove that other grants had been made than those noted in "Blotter B."

We do not think that if the eleventh instruction, asked by plaintiff, had been given, it could have influenced the verdict of the jury. The plaintiff's twenty-fourth instruction does not properly state the law.

Judgment and order denying a new trial affirmed.

Mr. Justice RHODES did not express an opinion.